No. 126,611

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

PATRICK RYAN HARRIS,
*Appellee*.

SYLLABUS BY THE COURT

1.

Appellate courts only have jurisdiction as provided by statute. Where an appeal is not taken consistent with this statutory authority, it must be dismissed for lack of jurisdiction.

2.

The State may not take an interlocutory appeal from an order suppressing evidence unless the exclusion of such evidence substantially impairs the State's ability to prosecute its case.

3.

This court is duty-bound to follow Kansas Supreme Court precedent absent some indication our Supreme Court is departing from its previous position.

Appeal from Johnson District Court; TIMOTHY P. MCCARTHY, judge. Submitted without oral argument. Opinion filed June 28, 2024. Appeal dismissed.

*Jacob M. Gontesky*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Kris W. Kobach*, attorney general, for appellant.

1

*Kelly R. Driscoll*, deputy public defender, of Johnson County Public Defender Office, for appellee.

Before SCHROEDER, P.J., ISHERWOOD and PICKERING, JJ.

SCHROEDER, J.:  Patrick Ryan Harris has been charged with multiple crimes, including two counts each of aggravated sexual battery and aggravated criminal sodomy. Prior to trial, the district court ruled certain evidence the State sought to admit was inadmissible:  (1) evidence of Harris' other crimes and (2) the testimony of an expert witness, Dr. Daniel Murrie. The State seeks review through an interlocutory appeal. As more fully explained below, we lack jurisdiction to consider either issue; thus, we dismiss the appeal.

FACTUAL AND PROCEDURAL BACKGROUND

We provide limited facts underlying the criminal charges at issue in this appeal which are based upon the victim's testimony at Harris' preliminary hearing.

In late 2016, the victim, S.H., met Harris when she applied for a job at the video store at which Harris managed. The pair eventually developed a sexual relationship, and S.H. wanted to explore a BDSM sexual relationship. The nonromantic, consensual sexual relationship evolved to include acts of BDSM, which S.H. understood to mean bondage, domination, sadism, or masochism and would entail Harris inflicting pain on her. Harris and S.H. had "safe words" to indicate when a participant was approaching or had reached his or her limits. S.H. explained that Harris was initially respectful of the use of these safe words.

During one sexual encounter, Harris inflicted more pain than usual. S.H. used her safe words, and Harris complied. S.H. explained the encounters were becoming more

2

forceful, commanding, and mean—both physically and verbally. After one of the encounters, S.H. took pictures of her buttocks that depicted bruising because she was "trying to figure out a way to get out." These photographs were admitted into evidence at the preliminary hearing.

S.H. eventually told Harris that she was not sure she could continue their sexual relationship. Harris told S.H. that there were three options:

- The pair continue their relationship;
- Harris takes what he wants from S.H.; or
- Harris finds out information about S.H.'s brother and takes what he wants from him.

S.H. interpreted the final option as a threat Harris would harm her brother. Harris reiterated the three options to S.H. while whipping her with a belt. S.H. later chose the first option because she feared what Harris would do. S.H. remained determined to find a way to get out of the relationship. Harris took a picture of S.H. during this encounter, which was admitted into evidence at the preliminary hearing.

At the pair's final encounter, Harris gave S.H. 33 "birthday spankings" on both her buttocks and breasts, causing marks and lumps to appear on S.H.'s breasts. Before leaving, Harris took a picture of S.H.'s photo identification card. S.H. took pictures of her breasts after this incident, which were admitted into evidence at the preliminary hearing.

About a week later, S.H. divulged what had been going on between her and Harris to her friends and brother, who convinced her to call the police. S.H. met with an officer and, later, detectives. S.H. provided law enforcement with a two-page written statement describing what happened. The statement did not claim Harris had forced S.H. to engage in sexual activity with him, but S.H. stated she "didn't know that what he was doing was

3

wrong." S.H. also turned over physical evidence she retained from their BDSM sexual relationship.

The State filed a pretrial motion to determine the admissibility of evidence of other crimes under K.S.A. 2017 Supp. 60-455. Specifically, the State alleged Harris had prior relationships with six women in which he "engaged in similar behavior, and some of it was criminal in nature." According to the State: "The evidence from these women show a pattern, motive, opportunity, plan, preparation, intent and material facts of how the defendant sought women out to inflict pain on them for his sexual gratification. Then how his behavior continued under force or threat to the victim, making it criminal."

Harris filed a response to the State's motion, arguing the evidence of other crimes identified in the State's motion was inadmissible. Specifically, Harris argued:

> "[T]he admission of any prior bad acts evidence is not relevant, does not go to any material fact at issue and any probative value that would be obtained by the admission of such evidence would be greatly outweighed by the prejudice caused to Mr. Harris and his right to a fair trial."

The district court later conducted a hearing on the State's motion. At the hearing, the State withdrew its attempt to seek the admissibility of evidence relating to Harris' relationships with four of the six women identified in its motion but continued to seek the admissibility of evidence relating to Harris' relationship with the remaining two women, K.E. and K.B. The State made a proffer of the evidence from both women it would seek to admit, but, because of the timing of the State's motion to reconsider and this interlocutory appeal, we find it unnecessary to detail the proffer.

The district court ruled the evidence at issue was inadmissible and explained its rationale for denying the requested evidence under K.S.A. 2017 Supp. 60-455(d). The

4

State asked the district court to clarify its ruling: "The Court is denying [the motion] as to K.E. because the ultimate conviction was not a sexual-related conviction. Is that my understanding?" The district court responded, "Correct. . . . Mr. Harris didn't plead to the sexual offense but he pled to aggravated battery 8. That is my ruling and my interpretation of 60-455(d)." After this ruling, the State failed to seek a timely interlocutory appeal.

As the case progressed, the State engaged the services of Dr. Murrie, a forensic psychologist, and asked him to prepare a report expressing his expert opinion on:

- "'The BDSM culture, e.g. standard practices within the culture, what is allowed and what is considered to be outside the bounds."
- "Mr. Harris's 'manner of operating' across offenses, including selection of victims and interactions with victims."
- "The 'victimology of his victims in these situations, e.g. how do they find themselves in these situations, why do they stay as long as they do, and the acute trauma response that a victim will show as well as what trauma exposure will look like long term.'"

Upon receiving a copy of Dr. Murrie's report, Harris filed a motion to exclude Dr. Murrie's testimony, arguing it was inadmissible because it would constitute improper expert opinion testimony. Specifically, Harris argued:

"[T]he proffered expert testimony from Dr. Daniel Murrie should be deemed inadmissible for a number of reasons, including, but not limited to, the fact that Dr. Murrie is (1) not qualified to testify as an expert witness, (2) his opinions will not help the trier of fact to understand the evidence or determine a fact in issue, (3) his opinions are not based upon sufficient facts or data, (4) his opinions are not the product of reliable principles and methods, (5) he has not reliably applied the principles and methods to the facts of this case; (6) the admittance of such testimony would violate Mr. Harris' right to

5

confront adverse witnesses (potentially), as well as his right to a fair trial, (7) the admittance of such testimony would be cumulative; (8) not relevant, and (9) any probative value of such opinion testimony would be greatly outweighed by the prejudice caused to Mr. Harris."

The district court set the matter for hearing on Harris' motion to exclude Dr. Murrie's testimony, at which Dr. Murrie testified by Zoom. The State clarified it was only pursuing the admission of Dr. Murrie's testimony as it related to the first question posed and addressed in his report: "'BDSM culture, e.g. standard practices within the culture, what is allowed and what is considered to be outside the bounds.'"

Harris subsequently filed a supplemental brief in support of his motion to exclude Dr. Murrie's testimony. The State also filed a motion to reconsider the district court's decision denying the admissibility of the State's evidence of other crimes over 10 months after the district court's ruling. Harris filed a response in which he argued, among other things, that the State's motion should be denied as untimely.

The district court conducted another hearing on both of Harris' challenges to the admission of Dr. Murrie's testimony and the State's motion to reconsider the district court's decision excluding the evidence of other crimes under K.S.A. 2017 Supp. 60-455(d). The State conceded its motion to reconsider was untimely but nevertheless urged the court to reach the merits of its motion. The district court ultimately denied the State's motion to reconsider its decision excluding the evidence of other crimes, reasoning:

> "I think that we should try this case as we do every other case: on the facts of this case. And I don't believe there is going to be a different standard for a jury to view as to whether or not somebody consented to sodomy or consented to a sexual act. And I think as the prosecutor ultimately said, there isn't a different standard for them, whether you're in the BDSM culture or not.
>     . . . .

6

"But the court is considering the State's motion to reconsider, and it is denied."

The district court also granted Harris' motion to exclude Dr. Murrie's testimony.

The district court later issued a written order reflecting its denial of the State's motion to reconsider and the exclusion of Dr. Murrie's testimony. The State now seeks interlocutory review.

ANALYSIS

*We Lack Jurisdiction to Consider the State's Motion to Admit K.S.A. 2017 Supp. 60-455(d) Evidence*

Harris first contends this court "does not have jurisdiction to consider the State's interlocutory appeal regarding the denial of the State's Motion to Reconsider the exclusion of [K.S.A.] 60-455 evidence in that such appeal is untimely." According to Harris: "The State's interlocutory appeal was untimely filed regarding the district court[']s exclusion of [K.S.A.] 60-455 evidence and as such, this Court is without jurisdiction to hear the appeal on this issue and such appeal should be dismissed." We agree.

*Standard of Review*

Whether the district court had subject matter jurisdiction to consider the State's motion to reconsider is a question of law subject to our unlimited review. *State v. Hillard*, 315 Kan. 732, 775, 511 P.3d 883 (2022). Whether appellate jurisdiction exists is likewise a question of law over which we exercise unlimited review. *State v. McCroy*, 313 Kan. 531, 533, 486 P.3d 618 (2021).

7

*Governing Law*

Subject matter jurisdiction may be raised at any time, including for the first time on appeal. *State v. Clark*, 313 Kan. 556, 560, 486 P.3d 591 (2021). Indeed, we have a duty to question jurisdiction on our own initiative. *State v. Marinelli*, 307 Kan. 768, 769, 415 P.3d 405 (2018). "'[P]arties cannot confer subject matter jurisdiction [on a court] by consent, waiver, or estoppel.'" *State v. Soto*, 310 Kan. 242, 249, 445 P.3d 1161 (2019). Moreover, if the district court lacked jurisdiction to make a ruling, we likewise lack jurisdiction over the subject matter on appeal. See *Kansas Fire and Safety Equipment v. City of Topeka*, 317 Kan. 418, 434, 531 P.3d 504 (2023).

Motions to reconsider, treated as motions to alter or amend a judgment under K.S.A. 2023 Supp. 60-259(f), apply in criminal cases in the absence of a specific statute to the contrary. See *In re Estate of Lentz*, 312 Kan. 490, Syl. ¶ 2, 476 P.3d 1151 (2020) "A motion to alter or amend a judgment must be filed no later than 28 days after the entry of judgment." K.S.A. 2023 Supp. 60-259(f).

The State may appeal from a pretrial order suppressing evidence, but the notice of appeal must be filed within 14 days after the entry of the order. K.S.A. 22-3603. However, the filing of a timely motion to alter or amend the judgment stops the appeal time from running. K.S.A. 2023 Supp. 60-2103(a); *State v. Swafford*, 306 Kan. 537, 540, 394 P.3d 1188 (2017). "'The filing of a timely notice of appeal is jurisdictional.'" *State v. Shelly*, 303 Kan. 1027, 1036, 371 P.3d 820 (2016).

*Discussion*

The district court ruled the State's evidence of other crimes under K.S.A. 2017 Supp. 60-455(d) was inadmissible on July 12, 2022. The State did not file its motion to reconsider until over 10 months later, on May 26, 2023, well beyond the 28-day time

8

period to file the motion. K.S.A. 2023 Supp. 60-259(f). The State's untimely motion to reconsider therefore did not toll the time to file an appeal. See *Board of Sedgwick County Comm'rs v. City of Park City*, 41 Kan. App. 2d 646, 650, 204 P.3d 648 (2009), *aff'd* 293 Kan. 107, 260 P.3d 387 (2011). And the State did not file its notice of appeal until June 28, 2023, almost a year after the district court's original ruling. The State's notice of appeal was untimely based on the district court's original July 12, 2022 ruling, denying the admissibility of the State's evidence of other crimes. We, therefore, lack jurisdiction to review the district court's decision excluding the State's evidence of other crimes, and the State's interlocutory appeal on that issue must be dismissed. See *State v. Myers*, 314 Kan. 360, 365, 499 P.3d 1111 (2021).

Moreover, the district court itself lacked jurisdiction to entertain the State's untimely motion to reconsider. K.S.A. 2023 Supp. 60-259(f) provides:  "A motion to alter or amend a judgment *must* be filed no later than 28 days after the entry of judgment." (Emphasis added.) "Time limits prescribed by statute are jurisdictional and cannot be waived or forfeited." *Board of Sedgwick County Comm'rs*, 41 Kan. App. 2d 646, Syl. ¶ 2. And because the district court lacked jurisdiction to entertain the State's motion to reconsider, we lack appellate jurisdiction over the issue. See *Kansas Fire and Safety Equipment*, 317 Kan. at 434.

Even if we did possess jurisdiction over the district court's denial of the State's motion to reconsider, and even if the district court did rely upon erroneous grounds in reaching its decision, we would nevertheless affirm the district court's denial of the motion as right for the wrong reason because the motion was untimely. See *Gannon v. State*, 302 Kan. 739, 744, 357 P.3d 873 (2015).

*We Find No Substantial Impairment of the State's Ability to Prosecute Its Case*

Harris next argues we lack jurisdiction over the State's interlocutory appeal from the district court's order excluding Dr. Murrie's testimony because the order did not substantially impair the State's ability to prosecute its case.

*Standard of Review*

Whether appellate jurisdiction exists is a question of law over which we exercise unlimited review. *McCroy*, 313 Kan. at 533.

*Governing Law*

The Kansas Supreme Court has long held a threshold requirement to permit the State to file an interlocutory appeal from a district court's pretrial order suppressing or excluding evidence is whether the ruling "substantially impaired the State's ability to prosecute" its case. *Myers*, 314 Kan. at 366; *State v. Sales*, 290 Kan. 130, 136, 224 P.3d 546 (2010); *State v. Mitchell*, 285 Kan. 1070, 1080, 179 P.3d 394 (2008); *State v. Griffin*, 246 Kan. 320, 324, 787 P.2d 701 (1990); *State v. Newman*, 235 Kan. 29, 35, 680 P.2d 257 (1984).

However, "an order excluding evidence need not completely prevent the State from obtaining a conviction to substantially impair its ability to prosecute." *Myers*, 314 Kan. at 366. As our Supreme Court has explained:  "[T]he evidence available to the State must be assessed to determine just how important the disputed evidence is to the State's ability to make out a prima facie case. . . . [E]vidence subject to a discretionary standard of admission is less likely to substantially impact the State's case." *Sales*, 290 Kan. at 140.

*Discussion*

The State claims the district court's exclusion of Dr. Murrie's testimony substantially impairs its ability to prosecute its case against Harris:

> "While the State will present the testimony of S.H., no eyewitnesses to the events will testify, nor will the jury view video or other independent evidence evincing that S.H. did not consent. For these reasons, Dr. Murrie's testimony about the boundaries of consent within a BDSM relationship are paramount—particularly when one considers the majority of jurors—if not all jurors—will have no common understanding or experience concerning the BDSM community. Because exclusion of Dr. Murrie's testimony substantially impairs the State's ability to prosecute the case, this Court should address the claim on the merits."

Harris responds the State has ample evidence available to prosecute its case without Dr. Murrie's testimony. Harris identifies the following evidence that is still available to the State:

- The testimony of S.H., who has an associate's degree and has been described by the State as a "cooperative witness";
- the testimony of multiple law enforcement officers involved in the case who can corroborate S.H.'s statements;
- the testimony of lab technicians who can testify about DNA evidence, including that S.H.'s DNA was allegedly found on a recovered taser;
- the testimony of S.H.'s brother and friends to whom she divulged the details of her relationship with Harris immediately before contacting the police;
- recovered communications between S.H. and Harris through email drafts;
- multiple photographs of S.H. depicting the injuries she sustained and the crude names Harris wrote on her body;
- photographs from a BDSM website that S.H. and Harris looked at together;

11

- S.H.'s written statement to law enforcement, outlining events that took place between her and Harris during the last several months of their relationship;

- a schedule S.H. provided to Harris to facilitate scheduling their encounters;

- a photo lineup in which S.H. identified Harris; and

- physical evidence including two markers, duct tape, and spoons.

Harris argues the State conceded the issue of consent is no different for someone engaged in a BDSM sexual relationship compared to a non-BDSM relationship. Specifically, during the June 16, 2023 hearing, the State admitted to the district court that "consent is still consent. A person can say yes or no to a certain act being perpetrated on them. . . . I don't think that the State has to prove anything different with these crimes versus aggravated criminal sodomy that occurs outside of a BDSM relationship." Harris further contends the State's argument that the jury must hear Dr. Murrie testify about the boundaries of consent within a BDSM relationship is inconsistent with what has been previously argued before the district court. In fact, during a hearing under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), Dr. Murrie agreed sexual acts should be consensual whether BDSM or otherwise. Regardless, Harris argues the district court did not abuse its discretion in denying Dr. Murrie's testimony because such testimony was unnecessary and would not help the trier of fact.

The evidence the district court excluded here—Dr. Murrie's testimony—was not based on evidence of the facts underlying the criminal charges at issue in this appeal. Rather, the State sought to admit Dr. Murrie's testimony for the purpose of aiding the jury in *understanding* the facts underlying the charges. Dr. Murrie's testimony would serve an ancillary role in the State's prosecution of its case against Harris. The State is still fully capable of presenting all the evidence at its disposal to prove beyond a reasonable doubt that S.H. did not consent to all the sexual contact at issue. This is true even if the State cannot present Dr. Murrie's testimony to explain his understanding of consent in a BDSM

relationship. In other words, Dr. Murrie's testimony may well *aid* the State in prosecuting its case against Harris; it may be *easier* for the State to prosecute its case if Dr. Murrie is found to be an expert and his expert testimony is allowed. But that is not the standard. The standard is whether the exclusion of Dr. Murrie's testimony substantially impairs the State's ability to prosecute its case against Harris. See *Myers*, 314 Kan. at 366.

The State has fallen woefully short of showing substantial impairment. As previously indicated, the State can provide S.H.'s testimony as well as that of law enforcement officers, lab technicians, and S.H.'s friends and family who were aware of the relationship and circumstances. The State also has physical evidence, including photographs from a BDSM website S.H. viewed with Harris; photographs S.H. took of her injuries; and markers, duct tape, and spoons used during their sexual encounters. The State can also rely on S.H.'s written statement to law enforcement describing her relationship with Harris and the sexual encounters she had with Harris during the last several months of their relationship. That is, the State can provide the victim's firsthand accounts of the incidents and whether she consented to Harris' actions.

Moreover, expert testimony is subject to a discretionary standard of admission by the district court. *State v. Aguirre*, 313 Kan. 189, 195, 485 P.3d 576 (2021); *Sales*, 290 Kan. at 140. The district court exercised its discretion in denying Dr. Murrie's testimony, explaining:

> "The Court did review both briefs on this issue as well, and we heard this in [a] previous hearing and heard Dr. Murrie testify by Zoom. Although this was—that was a *Daubert* hearing, I don't doubt that Dr. Murrie has expertise in a number of areas, as [the defense attorney] said, forensic evaluation of sex offenders, but also it appeared expertise in some BDSM cases, as he testified about.
> "But I don't think that the Court for this particular issue needs to get to that, whether or not he has expertise in this area, because the basis for my decision is 60-456, which has been cited by both sides.

13

"In addition to that, *United States vs. Becker*, . . . 230 F.3d 1224. It's a 10th Circuit case from 2000. Expert testimony is admissible where it will help the trier of fact to understand the evidence or determine fact or issue.

"K.S.A. . . . 60-456: If the jury can understand the evidence without needing the expert's specialized knowledge, the expert testimony is inadmissible.

"For that reason, the Court is going to deny the State's request to use Dr. Murrie as an expert in this case.

"And, again, as I stated in the other motion, I think that we ought to try this case based upon the facts in this case. And I don't believe that it would help the jury or that it's necessary for the jury to determine any of the questions that they would be asked at jury trial. And I think it might actually confuse them."

The district court never specifically qualified Dr. Murrie as an expert witness in this case. Because the decision to qualify Dr. Murrie as an expert witness is a discretionary call by the district court, the State's ability to prosecute its case is not substantially impaired.

The dissent recognizes this case is about two consenting adults in a BDSM relationship first initiated by S.H. but asserts the testimony of Dr. Murrie should be allowed to explain the limits of S.H.'s consent after the fact. We see three flaws with this argument. First, as we have both pointed out, the district court acknowledged Dr. Murrie might be an expert in some BDSM cases but never found him to be an expert on the issue of consent in BDSM relationships. The court also found his testimony was not needed and would just confuse the jury, citing K.S.A. 2023 Supp. 60-456 for support. Second, Dr. Murrie has never talked to, consulted with, or counseled S.H. and could only speak about consent generally in other BDSM relationships, not to the specifics of S.H.'s relationship with Harris. Third, neither party has raised, let alone briefed, the issue of whether our Supreme Court improperly interpreted K.S.A. 22-3603 as requiring the State to show substantial impairment of its case in order to take an interlocutory appeal. It is not the role of the appellate courts to fashion additional arguments on behalf of the

14

parties. *State v. Puckett*, 230 Kan. 596, 600-01, 640 P.2d 1198 (1982) ("[O]rdinarily an appellate court will not consider an issue which has not been raised in the trial court or which has not been raised by the parties on appeal."). Rather, our duty is analyzing the arguments actually raised—to the extent we have jurisdiction to consider them—by neutrally applying the controlling points of law to the facts reflected in the record on appeal.

Moreover, we observe there is an eminently valid reason for the State to be subject to the substantial impairment burden; otherwise, appellate courts would be overrun with appeals from the State whenever it is displeased with the pretrial rulings of the district court. In our view, the Supreme Court's prior determinations that requires substantial impairment to the State's case for it to file an interlocutory appeal soundly reconciles the various provisions governing appeals in criminal cases and is consistent with long-standing judicial principles barring piecemeal appeals. See *Myers*, 314 Kan. at 366 (State may file interlocutory appeal when ruling "substantially impair[s] the state's ability to prosecute" its case); *State v. LaPointe*, 305 Kan. 938, 949-50, 390 P.3d 7 (2017) (piecemeal appeals are disfavored). We recognize interlocutory appeals have a place in our criminal procedure; otherwise, orders of the district court that do substantially impair the State's ability to prosecute—suppression of evidence, as an example—could result in a not guilty verdict from which the State cannot appeal based on the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution.

In contrast, a defendant cannot take an interlocutory appeal under K.S.A. 22-3603. This limitation on a defendant's right to seek an interlocutory appeal reflects his or her right to appeal if found guilty to seek recourse in the event the district court erred. However, if K.S.A. 22-3603 is interpreted to allow the State to appeal from *any* nonfinal order and the defendant cannot, such an application of the statute would likely run afoul of the due process and equal protection concerns discussed in *State v. Burnett*, 222 Kan. 162, 167, 563 P.2d 451 (1977):

15

"The distinction between the state and the accused is not unreasoned. It serves a valid and legitimate public purpose to permit the state access to appellate review when matters essential to a prosecution are quashed or suppressed prior to trial. An individual defendant, unlike the state, may secure complete appellate review of all adverse rulings, and may secure effective relief, through a single appeal after trial, without constitutional impediment."

While the dissent suggests this analysis by our Supreme Court adds language not contained in the statute's plain language, our appellate courts are beholden to the principle that statutes must be construed in a constitutional manner whenever possible. *State v. Gonzalez*, 307 Kan. 575, 579, 412 P.3d 968 (2018). Moreover, we are duty-bound to follow Kansas Supreme Court precedent absent some indication our Supreme Court is departing from its prior position. *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). We observe no indication our Supreme Court is departing from its interpretation of K.S.A. 22-3603 limiting the State's right to take an interlocutory appeal to matters which substantially impair the State's case. Appellate courts only have jurisdiction as provided by statute. Where an appeal is not taken consistent with this statutory authority, it must be dismissed for lack of jurisdiction. Accordingly, we decline to accept appellate jurisdiction over the State's interlocutory appeal from the district court's order excluding Dr. Murrie's testimony.

As previously discussed, even if we had jurisdiction, the State would not be entitled to relief because the district court never qualified Dr. Murrie as an expert.

We observe no objection by the State to the district court's decision not to make more specific findings why Dr. Murrie would not be qualified as an expert witness in this matter. Where certain factual determinations by the district court are necessary to resolve the issue on appeal, the appellant must object to a lack of findings or request additional findings from the district court. *State v. Meggerson*, 312 Kan. 238, 249, 474 P.3d 761 (2020) (appellant must designate sufficient record to show error); see *State v. Espinoza*,

16

311 Kan. 435, 436-37, 462 P.3d 159 (2020) (party claiming error has burden to object to inadequate findings of fact and conclusions of law to give district court opportunity to correct any alleged inadequacies). Therefore, the State failed to properly preserve the issue below. Moreover, because the State has not addressed this point on appeal, we would have to deem it waived or abandoned if we had jurisdiction to consider it on the merits. *State v. Davis*, 313 Kan. 244, 248, 485 P.3d 174 (2021) (issue not briefed deemed waived or abandoned). But given our conclusion we lack jurisdiction, we, like the district court, "[do not] . . . [need] to get to that."

Appeal dismissed.

* * *

ISHERWOOD, J., dissenting: I respectfully dissent because I reach a distinctly different conclusion regarding the impact of the trial court's exclusion of Dr. Murrie's testimony. I do not take issue with the majority's conclusion that we lack jurisdiction to consider the State's motion to admit prior crimes evidence under K.S.A. 2023 Supp. 60-455(d).

As noted by the majority, S.H. and Harris developed an intimate, BDSM style relationship upon S.H.'s suggestion. What the majority does not include is that with S.H.'s consent, the relationship eventually transitioned to one grounded in master-servant practices with S.H. in the submissive role. The couple's activities gradually intensified, again with S.H.'s consent, until their conduct allegedly exceeded the boundaries of what S.H. contemplated when entering into the relationship. The State charged Harris with the commission of several unlawful sex acts as a direct product of his relationship with S.H. and the parties agree that the only disputed issue is consent. Where roughly only 5% of the population engages in these unconventional practices where words like "no," "stop," and "don't" do not carry force and effect but are replaced with other words, there is a

17

distinct possibility that a layperson juror lacks the common knowledge or experience, which they are specifically instructed to use, as would be required to undertake reasonable deliberations with respect to the element of consent, particularly where they are largely tasked with resolving a credibility contest between the parties. The district court's ruling deprived them of a critical tool necessary to a fully informed deliberation of the issue. Thus, I find that the district court's exclusion of Dr. Murrie's testimony, which would have explained how consent is viewed and interpreted within the BDSM culture, substantially impairs the State's ability to move forward with the prosecution of its case.

In analyzing the statute governing this case, K.S.A. 22-3603, research reveals that the "substantial impairment" phrase that captures our focus is not now, nor has it ever been, included within the clear and unambiguous statutory language since the Legislature adopted the provision in 1970. Rather, it appears to be the manifestation of arguably unnecessary statutory interpretation. That same research reflects that the statute has been afforded inconsistent treatment for an extended period of time, including instances where the reviewing court undertook an analysis of the merits in the State's interlocutory appeal without first requiring that it clear a jurisdictional hurdle attached to that "substantial impairment" language. Thus, I question whether the State truly bears an obligation to first demonstrate "substantial impairment" before we are vested with the authority to consider the merits of its claim.

To the extent the State does carry such a burden, I believe it has been satisfied here. While I agree that the *element* of consent, in and of itself, is no different for the crimes with which Harris is charged than in any other sexual offense prosecuted under the Kansas Criminal Code, I believe the nuances created by the very unique, particular facts of this case necessitate the introduction of Dr. Murrie's expert testimony to shed a clarifying light for the laypersons of the jury on how consent is viewed within the BDSM culture. Accordingly, I would find we have jurisdiction to consider the State's claim and

18

upon doing so, reverse the decision of the district court and remand with directions for further proceedings consistent with that finding.

I believe the factual recitation set out in the majority opinion is largely accurate. And while I strongly adhere to the principle that we have a responsibility to constrain our usage of graphic details to insulate the privacy and dignity of victims from any further harm, I firmly believe that a thorough analysis of the issue before us demands consideration of additional, critical facts surrounding the manifestation of the relationship between S.H. and Harris and the evolution of the conduct between them. I will endeavor to avoid the inclusion of gratuitous, salacious particulars.

The majority notes that the consensual sexual relationship between S.H. and Harris evolved to include acts of BDSM upon S.H.'s suggestion, and that the couple developed "safe words" for use when "a participant was approaching or had reached his or her limits." Slip op. at 2. The majority then goes on to recount how the relationship eventually exceeded the bounds of what S.H. contemplated when she first suggested that the two travel down this unconventional road. That body of facts provides the foundation for the majority's ultimate conclusion that the State's ability to prove its case against Harris is not compromised by the district court's exclusion of Dr. Murrie's testimony.

By virtue of S.H.'s preliminary hearing testimony, the record reflects that she and Harris commenced their relationship mid to late 2016, and about a year later, they gradually introduced new BDSM related activities. There is a particularly important phase of the couple's relationship which S.H. testified to that was not referenced by the majority but is one that carries the potential to play an integral role in the jury's deliberations when weighing the issue of consent which, again, the parties agree is the *only* disputed issue in this case. That phase is the sharp turn the relationship took following S.H.'s inquiry of Harris as to whether the couple could attend BDSM parties. S.H. testified that participation in such gatherings took on greater importance when she

19

encountered financial struggles, because Harris told her they could attend, and she could receive financial compensation for engaging in sex acts with other attendees. According to S.H., Harris informed her that those sexual activities would essentially require her to play the subservient role in a master-servant type relationship. Thus, she would need to learn to endure a measure of pain, withstand verbal abuse, and "act a certain way."

S.H. testified that she agreed to participate, and Harris encouraged her to visit a particular fetish focused website where she could learn more about what to expect from the parties. She stated that their meetings then transitioned from bi-weekly to weekly for her "training" purposes and it was at this time that Harris issued "commandments" for her to memorize as part of that "training"—directives that she would later frequently repeat as a mantra upon his command. Those "commandments" included, but were not limited to, requirements that she would not speak until spoken to, she would serve only him, she would respond to whatever name she was called, and she was required to do whatever Harris demanded. S.H. further explained that Harris directed her to refer to him by a name or term of her choice, so she settled upon the label of "Master." S.H. also provided Harris with a key to her apartment, as well as a copy of her schedule, and they agreed that whenever he arrived, she would be in a submissive position. That meant she would be on her knees, in the hallway, naked, but for a black collar, with her head bowed and her arms outstretched awaiting his command.

S.H. described one particular occasion when Harris brought a gun, a taser, and a knife to her home, laid them out on her table, and inquired whether she knew what they were for. When S.H. responded in the affirmative, Harris then asked whether he had to explain what they meant and, despite her answer of "no," Harris did so anyway. S.H. testified that Harris told her that she needed to know and understand that if they were going to continue training for the BDSM parties, that he would not hesitate to use those items, and he would not go to jail again, and she was not permitted to contact the police.

20

S.H. stated that despite feeling a bit of apprehension at that point, she did not share those feelings with Harris.

S.H. testified that it was around this time that the couple's activities intensified and that the oral sex she provided Harris at "every single" encounter became more physically aggressive. As it was from the beginning of the relationship, S.H. always filled the submissive role and was frequently given "homework" assignments to better understand her obligations. On one occasion, Harris instructed her to research various breathing techniques that would enable her to withstand the infliction of greater pain.

S.H. stated that following one of their encounters in early December, she had a face-to-face conversation with Harris concerning her ability to go forward with the relationship. She told him that she was "not sure" if she could continue or participate in the parties because the pain was so great. Harris responded by reminding S.H. that she agreed to engage in these activities and encouraged her to stay the course. S.H. testified that she agreed to do so. She explained that the encounters continued and in one instance, despite her desire to use her "safe words," she did not do so because of Harris' "commandment" that she was not to speak unless spoken to. On another occasion when S.H. told Harris to stop, he again reminded her that she agreed to the master-servant training and if she terminated it because of a "little bit of pain" all his time would have been wasted.

S.H.'s direct examination concluded with her decision to report the incidents to law enforcement at the end of December 2017.

On cross-examination, Harris' counsel elicited statements from S.H. by which she affirmed that from the outset, her interest in the relationship was purely sexual and that she got involved with Harris with the hope that he would teach her to become more sexually adventurous and help her explore BDSM activities. S.H. acknowledged that she

understood Harris' rules and that she agreed to be trained as the submissive in the master-servant relationship for the purpose of attending BDSM parties and exchanging sexual acts for money. S.H. denied that she and Harris ever negotiated or outlined precise limitations for their activities and that she specifically understood their behavior needed to intensify to enable her to adapt to the pain. She stated that despite the fact she did not particularly care for his rules and did not want to follow them she continued to do so. Finally, S.H. testified that she still assumed the agreed upon submissive position the final time that Harris visited her home and that when she provided her statement to law enforcement, she did not describe Harris' conduct as acts forced upon her.

Harris did not testify at the preliminary hearing.

*The evolution of K.S.A. 22-3603*

The State brings this interlocutory appeal to us for consideration under the authority of K.S.A. 22-3603. That provision simply states:

> "When a judge of the district court, prior to the commencement of trial of a criminal action, makes an order quashing a warrant or a search warrant, suppressing evidence or suppressing a confession or admission an appeal may be taken by the prosecution from such order if notice of appeal is filed within 14 days after entry of the order. Further proceedings in the trial court shall be stayed pending determination of the appeal."

The statute was first added to the Code of Criminal Procedure in 1970, and with the exception of a minor alteration in 2010 to increase the time in which the State has to file its notice of appeal from the original 10 days to the current period of 14 days, the language has remained unchanged.

Approximately seven years after adoption of the statute, the Supreme Court conducted an analysis of a defendant's claim that the provision gave rise to due process and equal protection concerns because it allowed for interlocutory appeals by the State but not the accused. See *State v. Burnett*, 222 Kan. 162, 563 P.2d 451 (1977). The issue was not framed as one requiring statutory interpretation, so the precise scope of the statute and its linguistic components were not technically at issue. Nevertheless, as part of its analysis of the constitutional claim, the *Burnett* court gratuitously observed that the Judicial Council Comment appended to K.S.A. 22-3603 stated that its purpose was "to permit appellate review of pretrial rulings *which may be determinative of the case*." (Emphasis added.) 222 Kan. at 166. In so doing it seemingly turned a blind eye to the longstanding rule that common words used in statutes must be given their ordinary meanings and it is only when "'the language is less than clear or is ambiguous'" that courts should "'move to statutory construction and use the canons of construction and legislative history and other background considerations to divine the legislature's intent.'" *Midwest Crane & Rigging, LLC v. Kansas Corporation Comm'n*, 306 Kan. 845, 850, 397 P.3d 1205 (2017) (quoting *Ambrosier v. Brownback*, 304 Kan. 907, 911, 375 P.3d 1007 [2016]); see also *State v. Foster*, 106 Kan. 852, 189 P. 953 (1920) (The rule of strict construction simply means that ordinary words are to be given their ordinary meaning.).

Three years later, this court was asked to determine whether a pretrial order denying the State's request to introduce evidence of other crimes fell within the scope of the statutory language allowing the State to pursue an interlocutory appeal from an order "suppressing evidence." See *State v. Boling*, 5 Kan. App. 2d 371, 617 P.2d 102 (1980). In so doing, it observed that while the question of jurisdiction was not raised by either party, the court issued a show cause order to address the same and cited the oft stated rule of appellate procedure that "'[i]t is the duty of an appellate court on its own motion to raise the question of its jurisdiction, and when the record discloses a lack of jurisdiction it must dismiss the appeal.'" 5 Kan. App. 2d at 372 (quoting *Henderson v. Hassur*, 1 Kan. App. 2d 103, Syl. ¶ 1, 562 P.2d 108 [1977]).

23

In conducting its analysis, the *Boling* court also turned to the Judicial Council's Comment as authority for the alleged "purpose" of the provision:

> "'The foregoing sections are intended to permit Supreme Court review of trial court rulings on pretrial motions which may be *determinative of the case*. The committee believed that in the case of trial court rulings which suppress evidence essential to proof of a prima facie case, the prosecution should have an opportunity for review in the Supreme Court if a substantial question exists as to the correctness of the trial court's decision.'" (Emphasis added.) 5 Kan. App. 2d at 373.

To buttress the direction of its impending analysis, the court stated that "all Judicial Council comments" are "persuasive as to legislative intent" and cited *Arredondo v. Duckwall Stores, Inc.*, 227 Kan. 842, Syl. ¶ 4, 610 P.2d 1107 (1980), and *Burnett*, 222 Kan. at 166-67, as support for that proposition. *Boling*, 5 Kan. App. 2d at 373. Yet, while citing *Burnett* which again, also focused on the phrase from the Judicial Council Comment that the evidence must be "determinative of the case," the *Boling* court shifted another direction and stated that the evidence under scrutiny "will be of a kind which is sufficiently important to the prosecution to warrant an immediate appeal." 5 Kan. App. 2d at 374. Then, despite asserting the court did "not mean to suggest that whether the evidence suppressed is essential to the state's case determines whether an appeal will lie," the court undertook an extensive analysis concerning the jurisdiction Kansas appellate courts have to review an interlocutory appeal and relied on a series of cases from Illinois as its guide, primarily, *People v. Van De Rostyne*, 63 Ill. 2d 364, 349 N.E.2d 16 (1976); *People v. Lara*, 44 Ill. App. 3d 116, 357 N.E.2d 1354 (1976); and *People v. Jackson*, 67 Ill. App. 3d 24, 384 N.E.2d 591 (1979). 5 Kan. App. 2d at 374-75.

The *Boling* court ultimately concluded that the State may properly pursue an appeal from those trial court orders that suppressed evidence obtained in violation of a criminal defendant's constitutional rights but is prohibited from appealing from those

orders which merely excluded evidence through operation of the statutory rules of evidence. *Boling*, 5 Kan. App. 2d 377-78. *Boling* also drew this jurisdictional line in the sand despite its observation that three earlier interlocutory appeals by the State were analyzed by our appellate courts without any mention of first satisfying "the jurisdictional question." 5 Kan. App. 2d at 377 (citing *State v. Dotson*, 222 Kan. 487, 565 P.2d 261 [1977]; *State v. Eubanks*, 2 Kan. App. 2d 262, 577 P.2d 1208 [1978]; *State v. Wilkins*, 220 Kan. 735, 556 P.2d 424 [1976]). It attempted to resolve that inconsistency by asserting that those cases "*implicitly recognize* appellate jurisdiction of an interlocutory appeal" and "in each of those cases the order had *a purpose closely akin* to that of the general exclusionary rule." (Emphases added.) *Boling*, 5 Kan. App. 2d at 377. In keeping with its view of K.S.A. 22-3603, the court determined that an order excluding other crimes evidence did not fall within the ambit of one "suppressing evidence" and the appeal was dismissed for a lack of jurisdiction. 5 Kan. App. 2d at 378.

That is to say, at this juncture, despite the absence of any express statement of jurisdictional parameters contained within the plain language of K.S.A. 22-3603, *Burnett* opined that the pretrial ruling appealed from must be "determinative of the case," while *Boling* found "the evidence will be of a kind which is sufficiently important to the prosecution to warrant an immediate appeal." *Burnett*, 222 Kan. at 166; *Boling*, 5 Kan. App. 2d at 374. Thus, there were two differing thresholds at play where the Legislature articulated none. *Burnett* is clear that its finding arises directly from the Judicial Council Comment. 222 Kan. at 166. But the origin of that articulated in *Boling* is less than clear. Perhaps it is an amalgamation of the three different standards set out in the Judicial Council Comment:

> "'The foregoing sections are intended to permit Supreme Court review of trial court rulings on pretrial motions which may be *determinative of the case*. The committee believed that in the case of trial court *rulings which suppress evidence essential to proof of a prima facie case*, the prosecution should have an opportunity for review in the

25

Supreme Court *if a substantial question exists as to the correctness of the trial court's decision*.'" (Emphases added.) 5 Kan. App. 2d at 373.

But while the notes and comments of the Kansas Judicial Council may be helpful in determining legislative intent, they are advisory only and do not have the force and effect of law. *State v. McCown*, 264 Kan. 655, 660-61, 957 P.2d 401 (1998). Judicial Council notes are not the equivalent of statutory law. *State v. Schlein*, 253 Kan. 205, 219, 854 P.2d 296 (1993). Despite these clear limitations on the use of the Judicial Council Comment, its contents have been construed to define the jurisdictional boundaries of a statute. In the nearly 50 years that have passed since the court's decision in *Burnett*, the Legislature has never taken any formal steps to alter the language of K.S.A. 22-3603 to include such a jurisdictional requirement. I recognize that when the Legislature fails to modify a statute to avoid a standing judicial construction of the statute, reviewing courts presume the Legislature intended the statute to be interpreted as the courts have done. See *In re Adoption of G.L.V.*, 286 Kan. 1034, 1052, 190 P.3d 245 (2008). Nevertheless, the absence of an official modification has allowed further ambiguity and inconsistency to develop around the statute's application.

Four years after *Boling*, the Supreme Court revisited the provision in *State v. Newman*, 235 Kan. 29, 680 P.2d 257 (1984), to determine whether the *Boling* court's interpretation of the provision was too narrow. Notably, this court reviewed the matter first and, in an unpublished opinion, deviated from *Burnett* and *Boling* to articulate yet a third jurisdictional standard that must be met to allow a reviewing court to consider an interlocutory appeal pursued by the State under K.S.A. 22-3603:

> "'In cases such as this where the evidence excluded may have been determinative of the case, *and* where the State's admissible evidence is so depleted that the State cannot in good conscience continue prosecution, some opportunity to appeal should be available.' [Citation omitted.]" (Emphasis added.) *Newman*, 235 Kan. at 34 (citing underlying ruling from the Court of Appeals).

26

To resolve the question before it, the *Newman* court followed the lead of *Boling* and returned to Illinois for an analysis of its caselaw. *Newman* observed that when the *Boling* court conducted its research, it did not have the benefit of *People v. Young*, 82 Ill. 2d 234, 412 N.E.2d 501 (1980), which rejected the narrow interpretation of the *Van de Rostyne* case that was ultimately adopted by the *Boling* court. By contrast, *Young* held that the phrase "suppressed evidence" should be afforded a broader interpretation than simply evidence which is illegally obtained, as *Boling* concluded. *Newman*, 235 Kan. at 33. The *Newman* court went on to find that "suppression" as used in K.S.A. 22-3603 should also be interpreted to include "rulings of a trial court which exclude state's evidence so as to *substantially impair* the state's ability to prosecute the case" so as to follow "the rule adopted by the Supreme Court of Illinois in" *Young*. (Emphasis added.) 235 Kan. at 34. The *Newman* court found this broader interpretation was also consistent with the standards adopted by the American Bar Association Project on Standards for Criminal Justice, specifically those relating to criminal appeals. Those standards provide, in part, that:

> "'1.4 Prosecution appeals.
> "'(a) The prosecution should be permitted to appeal in the following situations:
> . . . .
> "'(iii) from pretrial orders that seriously impede, although they do not technically foreclose, prosecution, such as orders granting confessions declared involuntary and inadmissible." *Newman*, 235 Kan. at 34-35 (quoting American Bar Association Project on Standards for Criminal Justice, Standards Relating to Criminal Appeals § 1.4 [1970]).

Thus, going forward, post-*Newman*, in pursuing an interlocutory appeal under K.S.A. 22-3603 a prosecutor presumably "should be prepared to make a showing to the appellate court that the pretrial order of the district court appealed from *substantially impairs* the State's ability to prosecute the case." (Emphasis added.) 235 Kan. at 35. The *Newman* court made no mention of what future use, if any, should be made of the previous jurisdictional standard that arose out of the Judicial Council Comment—that the

pretrial orders the State may appeal from are limited to those "which may be determinative of the case." 235 Kan. at 33.

An inconsistent approach to the jurisdiction question has materialized in the years following *Newman*. In several cases, it receives no mention or analysis with the reviewing court simply stating it has jurisdiction pursuant to K.S.A. 22-3603. See *State v. Manwarren*, 56 Kan. App. 2d 939, 440 P.3d 606 (2019); *State v. Bowles*, 28 Kan. App. 2d 488, 18 P.3d 250 (2001); *State v. Weas*, 26 Kan. App. 2d 598, 992 P.2d 221 (1999); *State v. Mosier*, No. 123,715, 2021 WL 3573842 (Kan. App. 2021) (unpublished opinion); *State v. Harbacek*, No. 105,391, 2011 WL 5390237 (Kan. App. 2011) (unpublished opinion); *State v. Johnson*, No. 83,773, 2000 WL 36745647 (Kan. App. 2000) (unpublished opinion). At least two cases confine their analysis to whether the ruling concerned a matter that was determinative of the case. See *State v. Clovis*, 248 Kan. 313, 807 P.2d 127 (1991); *State v. Wilson*, No. 117,125, 2017 WL 3948450 (Kan. App. 2017) (unpublished opinion). A fair number of cases use a hybrid analysis with the question often being whether the ruling was determinative of the case with the substantial impairment portion used to inform whether the ruling was truly determinative, including, but not limited to, *State v. Martinez-Diaz*, 63 Kan. App. 2d 363, 369, 372, 528 P.3d 1042 (2023); *State v. Perry*, No. 126,344, 2024 WL 1337476, at *3 (Kan. App. 2024) (unpublished opinion); *State v. Ross*, No. 118,393, 2018 WL 1884722, at *3 (Kan. App. 2018) (unpublished opinion); *State v. Guy*, No. 116,983, 2017 WL 3202977, at *1 (Kan. App. 2017) (unpublished opinion).

Additionally, there are instances where the reviewing courts acknowledge the substantial impairment standard from *Newman* but fail to review the remaining evidence. In most of these cases, the courts appear to focus on the importance of the suppressed evidence rather than the strength of the remaining evidence. See *State v. Myers*, 314 Kan. 360, 366-67, 499 P.3d 1111 (2021); *State v. Griffin*, 246 Kan. 320, 324-26, 787 P.2d 701 (1990); *State v. Galloway*, 235 Kan. 70, 73-74, 680 P.2d 268 (1984); *State v. Adams*, No.

126,130, 2024 WL 1686160, at *2 (Kan. App. 2024) (unpublished opinion); *State v. Dearman*, No. 110,798, 2014 WL 3397185, at *4 (Kan. App. 2014) (unpublished opinion).

Finally, in *State v. Mooney*, 10 Kan. App. 2d 477, 479-80, 702 P.2d 328 (1985), which was decided shortly after *Newman*, the court found that the requirement imposed upon the State to demonstrate substantial impairment of its ability to prosecute the case was limited to those pretrial orders that result in the suppression of evidence. That is, it had no applicability when the matter at issue involved "'quashing a warrant or search warrant'" or "'suppressing a confession or admission'" and in those instances the State may appeal as a matter of statutory right. A panel of this court followed the path laid by *Mooney* in *State v. Mburu*, 51 Kan. App. 2d 266, 271-72, 346 P.3d 1086 (2015).

Again, when adopting a broader interpretation of the provision, *Newman* drew guidance from the American Bar Association Project on Standards for Criminal Justice, specifically Standards Relating to Criminal Appeals. Section 1.4 of those standards indicate that "'[s]uch judgments are likely to rest upon principles that ought to be clearly and uniformly applied throughout the state.'" 235 Kan. at 35. Given the inconsistent manner in which the statute is seemingly applied by Kansas appellate courts, I am not convinced that goal of uniformity is being met. The majority issues a reminder that we are duty-bound to follow the precedent established by the Kansas Supreme Court until such time as that body expresses its intent to depart from the position at issue. It is not my intent to sidestep that obligation. My point is simply that as evidenced by the chronological case summary set out above, which includes inconsistent applications by our Supreme Court, it is unclear exactly which one of the iterations of the rule practitioners are expected to satisfy or this court is expected to adhere to when faced with an interlocutory appeal filed by the State under K.S.A. 22-3603.

*Substantial Impairment*

The question before us was framed by the parties in conformity with *Newman*. That is, whether the pretrial order excluding Dr. Murrie's testimony substantially impaired the State's ability to prosecute the case and that to assess the importance of the excluded evidence we should analyze that evidence which remains available to the State. After conducting this analysis, I find that the State's ability to prosecute Harris is substantially impaired as a result of the district court's pretrial ruling.

In this case, Harris is facing charges for, among other things, two counts each of aggravated sexual battery and aggravated criminal sodomy. Those alleged offenses arise directly from the BDSM relationship he and S.H. were mutually involved in. Both crimes require that the State prove beyond a reasonable doubt that S.H. did not consent to the precise sexual conduct at issue, and both parties agree that consent is the only disputed issue here.

The State sought the admission of Dr. Murrie's testimony for the limited purpose of discussing the BDSM culture generally, including standard practices, what is permitted, and what is outside the bounds of acceptable behavior. It was not contemplated that he would offer any opinions or observations with respect to the particulars of this case. After receiving Dr. Murrie's testimony at the hearing on defendant's motion to exclude the same, the district court declined to allow its admission. Notably, the district court did not articulate any specific ruling with respect to whether Dr. Murrie did or did not qualify as an expert. Rather, it found that while it did not "doubt that Dr. Murrie has expertise in a number of areas," including "expertise in some BDSM cases" it did not "think that the court for this particular issue needs to get to that, whether or not he has expertise in this area, because the basis for [its] ruling is 60-456 . . . ." In support of its conclusion, the district court determined that the testimony would not be of any help to the jury, may cause confusion, and was not necessary in order for the jury to

30

make a determination concerning the questions they would be asked to resolve. Rather, the case should simply be tried on its facts.

To be clear, as borne out by S.H.'s preliminary hearing testimony, what those undisputed facts for the jury consist of are that S.H. either encouraged or consented to:

- a relationship with Harris that was purely sexual and one where she could explore and become more adventurous with BDSM activities that include oral and anal sex;
- participation in BDSM parties, particularly for the purpose of engaging in sex with others for financial compensation;
- entry into a master-servant relationship with Harris that involved weekly training as a subservient in preparation for those parties, with full understanding that their sexual activities would intensify to enable her to withstand greater amounts of pain;
- adherence to "commandments" issued by Harris that required her to do whatever he asked, endure degradation, and not speak until spoken to;
- sustaining bruises and welts throughout the course of their relationship as a product of their sexual encounters;
- performing oral sex on Harris at the conclusion of each encounter, first so she could "learn more," then as the relationship progressed, she was required to first seek his permission to perform the act and did so to "thank [him] for [his] guidance";
- remaining in the relationship despite the increasing intensity because Harris reminded her it was what she agreed to and because the "commandments" prevented her from speaking until spoken to.

We do not know if or how Harris will testify at trial. But if the very pointed, consent related questions that were posed by his counsel during their cross-examination of S.H. at the preliminary hearing offer any insight, then any testimony Harris provides will likely focus on the extent to which S.H. willingly engaged in the various activities that transpired between them.

The details set out above should in no way be construed as a reflection of my opinion as to the ultimate element of consent. And in highlighting these facts I am also acutely aware of the two to three instances when Harris ignored S.H.'s use of her "safe words" and the corresponding pain reduced her to tears and hyperventilation. My point is simply that it is against this factual backdrop that the State will be required to ask a jury of laypersons to make a determination regarding consent. Thus, the outlined facts are offered merely to illustrate the complexity of this case and why, truly for the sake of the rights of both parties, a trial that involves more than an evidentiary display of the facts is required.

Highly truncated, Dr. Murrie's statements at the pretrial hearing reflect that he is prepared to testify that the primary focus of BDSM participants is the issue of consent, and they emphatically adhere to the principle that such activities only legitimately occur between consenting adults. Additionally, he would testify that the culture generally observes a number of formal guidelines which distinguish between consent and abuse, and that its advocacy groups publish educational materials for the law enforcement community and justice system which serve to illustrate the distinction between appropriate consensual BDSM activities and abuse. While Dr. Murrie did not spend time one on one with S.H. or Harris in preparing his report, he did review the testimony offered during the preliminary hearing, as well as reports from law enforcement officers, including their interview with S.H., photographs of S.H., and the investigating officers' interview with Harris. Again, the majority highlights that the district court "never found [Dr. Murrie] to be an expert on the issue of consent in BDSM relationships." Slip op. at

32

14. It is equally true that it never found he was not qualified as such. Rather, the district court judge ruled, "*I don't think that the Court for this particular issue needs to get to that, whether or not he has expertise in this area, because the basis for* [*its*] *decision*" was that his testimony would not be helpful to the jury. Thus, to be clear, the court never made a finding either way as to whether Dr. Murrie could be qualified as an expert.

In concluding that substantial impairment exists, I found *State v. Quinones-Avila*, No. 120,505, 2019 WL 3210224 (Kan. App. 2019) (unpublished opinion), instructive. That case involved the district court's pretrial exclusion of prior crimes evidence under K.S.A. 2018 Supp. 60-455(d) in a rape case.

At the outset of its analysis, the *Quinones-Avila* court observed that "many sex crime cases reduce to a 'he said she said' battle in which credibility and corroboration are crucial" and which "'lack concrete evidence that a crime was committed.'" 2019 WL 3210224, at *4. The court turned to the evidence that remained available to the State which included statements from Y.Q., as well as testimony from those to whom Y.Q. spoke about the incident, testimony from law enforcement officers, and results of the sexual assault exam which corroborated Y.Q.'s complaints of pain. 2019 WL 3210224, at *5. The *Quinones-Avila* court observed that "[t]he vast majority" of this evidence is simply based on Y.Q.'s statements and that the excluded evidence would "greatly strengthen the State's case by giving the jury more to consider than the credibility of the parties" and it could also serve to counter any assertions made by Quinones-Avila that the rape charges were fabricated. 2019 WL 3210224, at *5. In arriving at its conclusion, the *Quinones-Avila* court highlighted two earlier cases in which panels of this court held that the "exclusion of corroborating evidence in sex abuse cases can substantially impair the State's case even where, as here, the State had clear testimony from the victim." 2019 WL 3210224, at *5 (citing *State v. Bliss*, 28 Kan. App. 2d 591, 594, 18 P.3d 979 [2001]; *State v. Dearman*, No. 110,798, 2014 WL 3397185, at *6 [Kan. App. 2014] [unpublished

opinion]). I acknowledge that the opposite conclusion was reached in *State v. Sales*, 290 Kan. 130, 140, 224 P.3d 546 (2010).

Turning to the evidence that remains available to the State in the wake of the district court's exclusion of Dr. Murrie's testimony, the State's case essentially consists of the following:

(1) S.H.'s testimony;

(2) testimony from law enforcement officers;

(3) testimony from S.H.'s brother and friends to whom she disclosed the details of her relationship with Harris and who encouraged her to contact the police;

(4) S.H.'s written statement to police;

(5) testimony from lab technicians who can testify to DNA evidence from S.H. that was allegedly found on a taser;

(6) recovered email drafts between S.H. and Harris;

(7) photographs depicting injuries sustained by S.H. and the crude names Harris wrote on her body;

(8) photos of a BDSM website the couple visited together;

(9) a schedule S.H. provided to Harris to facilitate their encounters;

(10) the photo lineup from which S.H. identified Harris; and physical evidence including markers and wooden spoons.

Again, this case involved a largely consensual relationship between S.H. and Harris alone which spanned several months. The only disputed issue is S.H.'s consent with respect to a limited number of very particular acts between them. For that reason, I do not believe factors 6-11 above serve to advance the State's case on that issue. Given the duration of the relationship and S.H.'s testimony to the presence of the taser on more than one occasion, I believe factor number 5 has the potential to carry limited weight with a jury. That leaves factors 1-4 which include S.H.'s statements and iterations thereof.

34

As set forth earlier in my opinion, the jury will hear a great deal of evidence concerning what S.H. encouraged or consented to as part of this relationship which, in my mind, makes her statements, and those she made to others, vulnerable to impeachment. Thus, I find that, in line with *Quinones-Avila*, *Bliss*, and *Dearman*, the State's case is substantially impaired by the district court's exclusion of Dr. Murrie's testimony. That evidence could be used to corroborate S.H.'s assertions that the conduct at issue far exceeded the scope of the consented-to portion of the relationship and counter any likely claims made by Harris that the acts fell squarely within the bounds of their mutually agreed upon entry into a master-servant relationship where only S.H. would play the subservient role and agreed to follow his commands and not speak unless spoken to.

A final and rather compelling case worthy of mention is *State v. Martinez-Diaz*, 63 Kan. App. 2d 363, 528 P.3d 1042 (2023). In that case, the State charged Alejandro Martinez-Diaz with attempted first-degree murder of Javier Romero and Caylee Nehrbass. It pursued an interlocutory appeal after Romero refused to testify at trial and the district court denied the State's request to find him unavailable and admit his preliminary hearing testimony at trial. Martinez-Diaz argued this court lacked jurisdiction over the appeal because the State failed to demonstrate the ruling substantially impaired its ability to prosecute the case. As support, he pointed to the fact that Nehrbass' and Romero's testimonies would go to the same facts. Thus, according to Martinez-Diaz, Romero's testimony was merely corroborative evidence. 63 Kan. App. 2d at 369-70.

This court found that Martinez-Diaz' argument "ignores that a substantial impairment of the State's ability to prosecute is more nuanced than the mere production of evidence of the crime." 63 Kan. App. 2d at 371. Rather, the State's burden not only includes the burden of production but also the burden of *persuasion*, and both components must be considered when weighing whether a pretrial ruling substantially impairs the State's ability to move forward with the prosecution of its case. 63 Kan. App.

2d at 371. The court observed that in arguing that Nehrbass could testify to the same events as Romero, Martinez-Diaz' contentions focused on the burden of production. By contrast, the State focused on the burden it carried to persuade the jury of Martinez-Diaz' guilt "'at the beyond-a-reasonable-doubt level of confidence.'" 63 Kan. App. 2d at 371 (quoting *State v. Mukes*, No. 117,082, 2018 WL 4264865, at *6 [Kan. App. 2018] [unpublished opinion]). It found that the State would experience "serious difficulties" in satisfying this burden if forced to rely on Nehrbass' testimony alone. First, her statements were vulnerable to impeachment as a result of her possible inability to accurately perceive and recount the shooting. Further, her testimony could not stand in replacement of Romero's because jurors would conceivably wonder why he was not also testifying against the man alleged to have tried to take his life, and potentially draw a negative inference from that absence—an inference that may in turn cause the jury to penalize the State for its failure to bring that evidence forward. 63 Kan. App. 2d at 372; see also *State v. Chaney*, 269 Kan. 10, 19, 5 P.3d 492 (2000) ("The jury determination of whether consent was given or was valid requires consideration of all facts surrounding the event, not simply the words spoken.").

A similar analysis informs my decision here. Substantial impairment is not merely a matter of the quantity of the evidence that remains at the State's disposal following the pretrial exclusion, but the *quality* of that evidence. Again, what remains are S.H.'s statements both personally, as well as those made to others on the same subject matter— statements the jury may readily discount when weighed against the considerable number of factors it may perceive as compelling evidence of consent. Thus, going forward with those statements alone may undermine the State's ability to carry its burden of persuasion. The addition of Dr. Murrie's testimony as the only neutral evidence that could possibly be relied upon to determine whether the facts here truly illustrate consensual conduct throughout the duration of the relationship between S.H. and Harris ensures the State is not unfairly compromised in its efforts.

Jurors are instructed that they may rely upon their common knowledge and experience during deliberations, yet Dr. Murrie testified that interest in BDSM relationships exists within only roughly 5% of the population. It is unclear to me how a jury can be tasked with returning a well-deliberated decision on the matter of consent in such an exceptionally unique case when they are deprived of crucial information necessary to yielding the same. I would reverse the decision of the district court.

Some of the earliest cases involving K.S.A. 22-3603 state that it is to enjoy a broad interpretation because "it serves a valid and legitimate public purpose to permit the [S]tate access to appellate review when matters essential to a prosecution are quashed or suppressed prior to trial." *State v. Burnett*, 222 Kan. 162, 167, 563 P.2d 451 (1977); see *Newman*, 235 Kan. at 34. The *Burnett* court further instructed that once avenues of appellate review are established, they "'must be kept free of unreasoned distinctions that can only impede open and equal access to the courts.'" 222 Kan. at 167 (quoting *Williams v. Oklahoma City*, 395 U.S. 458, 459, 89 S. Ct. 1818, 23 L. Ed. 2d 440 [1969]). In my view, the majority's decision fails to honor the broad interpretation the statute was intended to be afforded.

The admission or exclusion of an expert's testimony generally lies within the sound discretion of the district court. *State v. Edwards*, 299 Kan. 1008, 1015, 327 P.3d 469 (2014). A court abuses this discretion if its decision to admit or omit expert testimony is based on an error of law, error of fact, or is so arbitrary that no reasonable jurist would agree. See *State v. Crosby*, 312 Kan. 630, 635, 479 P.3d 167 (2021).

"'Discretion is the freedom to act according to one's judgment; and judicial discretion implies the liberty to act as a judge should act, applying the rules and analogies of the law to the facts found after weighing and examining the evidence—to act upon fair judicial consideration, and not arbitrarily.'" *Saucedo v. Winger*, 252 Kan. 718, 729-30, 850 P.2d 908 (1993) (quoting *State v. Foren*, 78 Kan. 654, 658-59, 97 P. 791 [1908]).

The abuse of discretion """is really a discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence." *Murray v. Buell et al.*, 74 Wis. 14, 19, 41 N.W. 1010 [1889].)'" *Deeds v. Deeds*, 108 Kan. 770, 774, 196 P. 1109 (1921). I would find the exclusion of Dr. Murrie's testimony is not only unreasonable but runs contrary to the evidence in this case and reverse the decision of the district court.